UNITED STATES DISTRICT COURT
FOR THE
WESTERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| MARIA R., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:17-cv-279 |
| | ) | |
| NANCY A. BERRYHILL, | ) | |
| Acting Commissioner of | ) | |
| Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

**OPINION AND ORDER GRANTING PLAINTIFF'S MOTION FOR JUDGMENT ON THE PLEADINGS AND DENYING THE COMMISSIONER'S MOTION FOR JUDGMENT ON THE PLEADINGS**
(Docs. 11 & 13)

Plaintiff Maria R. is a claimant for Social Security Disability Insurance ("SSDI") benefits under the Social Security Act. She brings this action pursuant to 42 U.S.C. § 405(g) to reverse the decision of the Social Security Commissioner (the "Commissioner") that she is not disabled[1] and has moved for judgment on the pleadings. The Commissioner has cross-moved for a judgment affirming the Commissioner's decision. The court took the pending motions under advisement on January 16, 2018.

After her SSDI application was initially denied by the Social Security Administration ("SSA"), Administrative Law Judge ("ALJ") William Weir found Plaintiff ineligible for benefits based on his conclusion that she can perform jobs that

---

[1] Disability is defined as the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). A claimant's "physical or mental impairment or impairments" must be "of such severity" that the claimant is not only unable to do any previous work but cannot, considering the claimant's age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy. 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

exist in significant numbers in the national economy and was therefore not disabled at any time after her alleged onset date of June 5, 2011.

Plaintiff identifies two errors in the disability determination: (1) the ALJ failed to obtain necessary medical opinion evidence with respect to her mental impairments and improperly relied on his own lay opinion; (2) the ALJ improperly characterized two treating physicians' opinions while determining Plaintiff's Residual Functional Capacity ("RFC").

Plaintiff is represented by Kenneth R. Hiller, Esq. and Timothy Hiller, Esq. Special Assistant United States Attorney Haseeb Fatmi represents the Commissioner.

## I.  Procedural History.

On May 23, 2013, Plaintiff filed an application for a period of SSDI benefits under Title II of the Social Security Act. Her application was denied on August 21, 2013. Plaintiff timely requested a hearing before an ALJ on August 26, 2013.

On April 27, 2015, ALJ Weir presided over Plaintiff's hearing in Buffalo, New York. Plaintiff appeared in person at the hearing with her attorney. Vocational Expert ("VE") David Sypher testified by telephone. On August 3, 2015, ALJ Weir issued a written decision finding Plaintiff ineligible for benefits.

Thereafter, Plaintiff filed a request for review with the SSA's Office of Disability Adjudication and Review Appeals Council ("Appeals Council"), which denied her request on January 31, 2017. ALJ Weir's 2015 determination therefore stands as the Commissioner's final decision.

## II.  Factual Background.

Plaintiff was born in 1968 and completed high school before beginning work at a daycare center and then later as a housekeeper and laundry supervisor at a hotel. On June 5, 2011, she suffered an injury while moving a heavy load of laundry which resulted in on-going lower back pain. Although she worked intermittently following this incident, her wages were insufficient to qualify as substantial gainful employment under SSA regulations through the date of the ALJ's decision.

## A.     Medical History.

Plaintiff did not seek emergency medical care following her workplace injury, but instead sought a non-emergent evaluation at Jericho Road Family Practice ("JRFP"). She later sought treatment at Zenith Medical ("Zenith") in connection with ongoing symptoms which affected her ability to continue work as a laundry supervisor at the Adam's Mark Hotel in Buffalo, New York. On February 11, 2011, Salina Mayes, FNP informed Plaintiff's employer that she could return to work on February 14, 2011, but indicated the following restrictions: no lifting greater than twenty-five pounds, no repetitive bending, twisting, pushing, or pulling, and no sitting or standing for longer than sixty minutes at a time. Ms. Mayes recommended that these restrictions remain in place for approximately one month following Plaintiff's return to work.

On March 29, 2011, Plaintiff underwent an MRI which did not reveal any fractures or dislocations, but did indicate "prominent straightening of the lumbar lordosis probably due to muscle spasm" as well as "disc space narrowing and spondylosis with degenerative anterior spurring and posterior ridging" at the L4-L5 level. (AR at 247.) The attending radiologist, Joseph Serghany, M.D., also observed a "broad based posterior protrusion extending approximately 4 mm into the spinal canal and mildly effacing the ventral thecal sac." *Id.* He did not, however, note any "central or foraminal stenosis[.]" *Id.* In addition, Dr. Serghany found "spondylosis and degenerative changes of the endplates with broad based central to right paracentral herniation indenting the ventral thecal sac" at the L5-S1 disc level. *Id.*

On May 3, 2011, Plaintiff was evaluated by Cameron B. Huckell, M.D. at Zenith on the referral of Conrad Williams, M.D. Plaintiff's primary care physician recommended that Plaintiff make an appointment with providers at Zenith because she sought to pay for care with New York State workers' compensation funds, which her primary care physician did not accept. At this appointment, Plaintiff reported that she was injured while working on January 5, 2011, but denied "any specific accident or injury," instead attributing her back pain "to the cumulative effects of a highly physical job as a laundry supervisor[.]" (AR at 249.) Plaintiff reported a "constant dull ache with

3

pressure" in her lower back which she rated as a seven out of ten on average and a ten out of ten at its worst. *Id.* She explained that her back pain was exacerbated by movement. Dr. Huckell noted that Plaintiff continued to work full time as of the date of her appointment, but that she remained restricted to light duties. A physical examination revealed Plaintiff's normal gait, ability to heel and toe walk, and adequate balance and coordination. She exhibited some limits in her lumbar range of motion and a positive straight leg raise test on her right side at fifty five degrees, but retained full strength in her lower extremities bilaterally with normal deep tendon reflexes. Dr. Huckell's review of x-rays taken on May 3, 2011 indicated disc space narrowing across the span from L4 to S1, but "[n]o evidence of segmental instability" or "spondylosis or spondylolisthesis." (AR at 251.)

After reviewing Dr. Serghany's notes regarding Plaintiff's March 29, 2011 MRI, Dr. Huckell concluded that Plaintiff "suffered significant injuries to the spine as a result of the work related accident" (AR at 253) and diagnosed disc herniation in her lumbar spine without myelopathy and lumbar radiculitis. He opined that Plaintiff's condition did not require a surgical intervention, but that "she is a reasonable candidate for a right sided L5-S1 epidural injection." *Id.* Dr. Huckell further recommended that Plaintiff "continue all conservative care" including physical therapy with Dr. Williams. *Id.* In addition to these rehabilitative measures, Dr. Huckell imposed the following work restrictions: no bending, stooping, reaching, twisting, crawling, or climbing; no lifting greater than twenty pounds; no sitting, standing, or walking for more than sixty minutes without a break; and a work day lasting no more than eight hours. He scheduled Plaintiff for a follow-up appointment in one month.

On June 3, 2011, Plaintiff returned to Dr. Huckell for a visit at which she reported continued symptoms despite regular attendance at physical therapy. Plaintiff continued her full-time, light duty employment during the interval between her appointments. Physical examination revealed a normal gait, the ability to heel and toe walk, and adequate coordination. Dr. Huckell observed paravertebral muscle rigidity and limited lumbar range of motion, and a positive straight leg raising test on the right side at thirty-

4

five degrees. Plaintiff's strength was slightly diminished in her right foot, but was otherwise five out of five. She possessed normal deep tendon reflexes. Dr. Huckell's opinion, diagnosis, and work restrictions remained unchanged, and he again suggested epidural injections. Plaintiff expressed a desire "to give it more [thought] first before committing." (AR at 258.) Dr. Huckell scheduled a one-month follow-up appointment.

On June 17, 2011, Plaintiff saw Dr. Williams and reported that physical therapy was helping her back pain, but that her leg pain was increasing. On June 21, 2011, Dr. Williams completed a "Certification of Health Care Provider for Employee's Serious Health Condition" provided by the United States Department of Labor in connection with Plaintiff's claims under the Family and Medical Leave Act. Dr. Williams certified that Plaintiff "cannot work" due to her back injuries and noted that she attended physical therapy between two and three times per week. (AR at 495-96.)

Plaintiff returned for a third appointment with Dr. Huckell on July 8, 2011. He recorded that after her prior appointment, Ricardo Melendez, N.P. removed her from work duties "secondary to severe low back and right leg pain. Her last day working was 6/17/11." (AR at 260.) Mr. Melendez prescribed a course of Lortabs for pain management, and Plaintiff continued physical therapy following her suspension from work duties. She reported that her back pain remained essentially unchanged since her last visit. Dr. Huckell's physical examination notes for this appointment were substantively the same as his observations made during the June 21, 2011 visit. Dr. Huckell reiterated his prior assessment, diagnosis, and work restrictions. He also indicated that he would seek "authorization through the Workman's Compensation Board for [a] [s]eries of three right sided L5-S1 epidural injections." (AR at 263.) Plaintiff was scheduled for a three month follow-up visit.

On July 16, 2011, Plaintiff saw Dr. Williams for trigger point injections because her pain had become "unbearable." (AR at 414.) She reported that medications helped control her pain, but that their effectiveness was limited. Dr. Williams noted that Plaintiff desired epidural injections and would see Dr. Huckell for a series of three injections after her insurance approved the procedure. Plaintiff walked with an antalgic

gate at this examination, and heel walking was painful. She possessed normal posture and spinal contour, and Dr. Williams recorded bilateral paravertebral muscle spasms and a full range of spinal motion with discomfort. She received three injections of Marcaine in her lumbar paraspinal musculature and tolerated the procedure well.

On August 12, 2011, Richard J. Mutty, M.D. performed an independent orthopedic evaluation of Plaintiff in connection with her workers' compensation claim. Plaintiff related her history of physical therapy and treatment with Dr. Huckell and indicated that she wore a back brace. Physical examination revealed Plaintiff's normal gait, appearance, and posture. She was able to remove her shoes without difficulty, get up on the examination table, and sit comfortably throughout the course of the examination. She could heel and toe walk normally and had negative straight leg raising tests bilaterally. Plaintiff complained of mild tenderness at the L3-S1 level of her lumbar spine and exhibited decreased range of motion. Dr. Mutty did not observe any evidence of muscle atrophy in Plaintiff's lower extremities. After reviewing Dr. Huckell's and Dr. Williams's examination notes, Dr. Mutty diagnosed "[l]umbar spine L4-L5 disc herniation, resolving." (AR at 311.) He opined that "[t]here is evidence of a mild partial orthopedic disability of 25%. The claimant is capable of working with restrictions of performing light duties only." *Id.* Dr. Mutty also opined that Plaintiff's condition had "reached maximum medical improvement in [his] specialty, orthopedics, in terms of improvement relative to injuries stemming from her work-related accident of January 5, 2011[.]" *Id.*

An August 12, 2011 status note from Dr. Williams indicated that Plaintiff's July 2011 trigger point injections had helped ease her symptoms, and that she was "feeling better pain wise and ready at this time for a trial to go back to work[.]" (AR at 386.) On September 10, 2011, Dr. Williams recorded that Plaintiff had returned to work with light duty restrictions, and remarked that she was "tolerating though her pain levels have worsened since starting [work]." *Id.* He noted decreased range of motion in Plaintiff's upper back but confirmed normal posture and spinal contour. She experienced pain while

heel walking bilaterally and exhibited bilateral paravertebral muscle spasms. Plaintiff possessed a full range of spinal motion with discomfort.

Plaintiff returned to Dr. Huckell for a follow-up appointment on December 13, 2011, at which she related that she had been terminated from her role as a laundry supervisor at the Adam's Mark Hotel following her removal from light duty work in November 2011. Plaintiff continued to participate in bi-weekly physical therapy and received pain management treatment from Dr. Williams. The results of a physical examination were unchanged: Plaintiff possessed a normal gait, the ability to stand on heels and toes, and adequate balance and coordination without the use of any assistive devices. Dr. Huckell's assessment, diagnosis, recommended workplace restrictions, and treatment plan remained unaltered.

Gary Wang, M.D. performed an electromyography and nerve conduction velocity study of Plaintiff's lumbar and sacral spine on January 7, 2012. His impression was that of "residual or chronic bilateral S1 radiculopathy, right side more than left side." (AR at 480.) Dr. Wang noted, however, that there were "[n]o signs of significant active exacerbation." *Id.* He further noted "[n]o electrodiagnostic evidence of significant peripheral polyneuropathy of lower limbs." *Id.*

On February 23, 2012, Plaintiff visited Dr. Huckell and reported essentially unchanged symptomology, rating her pain as a seven out of ten on average and a nine out of ten at its worst. Physical examination demonstrated paravertebral muscle rigidity, a positive straight leg raising test on the right side at thirty-five degrees, and decreased range of motion in her lumbar spine. She possessed a normal gait, the ability to heel and toe walk, and adequate balance and coordination. Dr. Huckell again recommended epidural injections, but Plaintiff stated she was "trying to tolerate her symptoms with pain management and physical therapy through Zenith[.]" (AR at 271.)

Plaintiff had a lumbar x-ray on March 7, 2012, which revealed "[m]inimal thoracolumbar scoliosis and loss of lordosis. Mild degenerative disc narrowing and endplate spurring L4-L5 and L5-S1." (AR at 323.) There was no evidence of fracture or dislocation and Plaintiff's SI joints were intact. The attending radiologist opined that the

"[f]indings suggest[] muscle spasm, [d]egenerative disc changes L4-L5 and L5-S1." *Id.*
Thereafter, on March 22, 2012, Plaintiff underwent a CT scan which indicated
"degenerative disc disease at the L4-L5 and L5-S1 levels, with endplate sclerosis and
anterior spurring." (AR at 322.) The attending radiologist noted "disc height reduction
of moderate degree at L4-L5[,]" as well as a "[b]road-based midline disc protrusion,
which does not appear to impinge upon the exiting L4 or L5 nerve roots." The
radiologist further observed a "broad-based right paracentral disc protrusion, but neither
the right [nor] the left S1 nerve roots appear to be impinged upon." *Id.* His impression
was that of "lower lumbar degenerative disc disease at L4-L5 and L5-S1." *Id.*

On April 5, 2012, Dr. Mutty reevaluated Plaintiff, who reported the same physical
symptoms and that she had been terminated from her prior employment but intended to
return to work "when she can find a job that can accommodate her restrictions." (AR at
304.) On physical examination, Dr. Mutty noted that Plaintiff used a back brace but
found her gait normal and noted that she was able to move to the examination table,
remove her outwear, and sit comfortably throughout the appointment. He observed
Plaintiff's decreased range of motion in her lumbar spine and negative straight leg raising
test at eighty degrees bilaterally.

Plaintiff attended a neurology consultation at Zenith with Elad I. Levy, M.D. on
May 9, 2012. Plaintiff reported "good days and bad days depending on her activity[,]"
and rated her back pain as a seven out of ten on average. (AR at 338.) Dr. Levy
reviewed her imaging results and concurred with the earlier radiologists' reports.
Physical examination revealed Plaintiff's normal gait but a positive result on a right side
straight leg raise test. Dr. Levy observed that Plaintiff had participated in only two weeks
of physical therapy at the time of her appointment. He prescribed a Medrol-Dosepak, a
form of steroids, and scheduled a follow-up appointment after she received more
treatment. Plaintiff returned to Zenith neurology on July 11, 2012, and reported that
physical therapy had resulted in an approximately forty-five percent improvement in her
symptoms. She further reported that she was unable to tolerate the Medrol-Dosepak due

to stomach discomfort.  Dr. Levy discussed surgical options but Plaintiff chose to continue with physical therapy.

Plaintiff returned to Dr. Mutty on August 30, 2012, who noted that Plaintiff remained unemployed.  She wore a back brace but retained a normal gait, sat comfortably, ascended and descended from the exam table without assistance, and turned from side to side and from back to front freely.  Upon physical examination, Dr. Mutty recorded Plaintiff's complaint of "mild tenderness upon palpation over L3, L4, L5, and S1 disc space levels" with decreased range of motion in her lumbar spine and a positive left side straight leg raising test.  Plaintiff could not heel or toe walk but her extremity strength and deep tendon reflexes remained intact.  Dr. Mutty's diagnosis at this re-evaluation was a "lumbar spine sprain/strain with the impression of residual or mild chronic bilateral L5-S1 radiculopathy, right side more than left side[.]"  (AR at 300.)  He opined that Plaintiff was able to perform light work duties with limited bending, and was capable of lifting up to twenty-five pounds.  He further stated that, "based on [his] examination, the claimant has reached maximum medical improvement." *Id.*  In addition to his examination report, Dr. Mutty completed a functional assessment as part of Plaintiff's state workers' compensation claim, wherein he opined that she could lift, carry, push, or pull twenty-five pounds without limitation but was limited to only occasionally performing a range of postural activities.

On October 18, 2012, Plaintiff returned to Zenith for a follow-up visit, and Dr. Levy ordered a new MRI which was performed on November 3, 2012.  Uzma Alam, M.D., the attending radiologist, opined that Plaintiff suffered from "mild to moderate right neural foraminal narrowing due to a right paracentral annular bulge" at L5-S1 and "bilateral recess narrowing" from a second annular bulge at L-4-L5.  (AR at 321) (capitalization omitted).  Plaintiff then attended a follow-up visit with Dr. Williams on November 7, 2012, where a physical examination revealed an antalgic gait and inability to heel and toe walk but normal posture and muscle tone with full range of motion.  Plaintiff reported that pain medication provided relief from her symptoms.

On December 5, 2012, Plaintiff attended an appointment with Thomas Lo, M.D. at Zenith. Dr. Lo observed that Plaintiff was alert and oriented, and that her cranial nerves were intact. He noted that he "spoke at length" with Plaintiff regarding epidural steroid injections as a pain management technique, but Plaintiff indicated that she preferred to continue with pain medication and chiropractic treatment. (AR at 285.) She stated that she would discuss injections with Dr. Williams and reconsider them at a follow-up visit in two months.

On January 29, 2013, Plaintiff returned to Dr. Huckell and reported continued pain in her lower back that averaged eight out of ten. Plaintiff walked with a normal gait and stood on her toes and heels with adequate balance and coordination. Dr. Huckell noted paravertebral muscle rigidity but normal range of motion and intact extremity strength. Plaintiff had a positive straight leg raising test on the right side and possessed a normal mood and affect. Dr. Huckell did not substantively modify his prior physical work restrictions and continued to recommend that Plaintiff obtain epidural steroid injections to mitigate her pain. Plaintiff was evaluated by Dr. Huckell again on March 12, 2013, and his assessment and work restrictions remained unchanged. Plaintiff was scheduled for an epidural steroid injection which she received on March 26, 2013.

Grant Sorkin, M.D. saw Plaintiff at a neurosurgery clinic on April 10, 2013 where she reported that her symptoms were "not worse but certainly not better compared to previous[]" visits. (AR at 327.) She further reported that chiropractic care provided some temporary pain relief and that her first epidural steroid injection did not provide significant benefits. She nonetheless indicated her willingness to try another injection. Dr. Sorkin opined that "[a]t this point, [Plaintiff] is stable from a conservatively managed low back pain and radiculopathy." Id. He scheduled a follow-up appointment in three months.

On April 17, 2013, Plaintiff reported to Dr. Williams that she had recently begun a work preparation program in order to receive public benefits, but that the program had significantly exacerbated her symptoms. She stated that a butrans patch (which delivers opioid pain medication) did not adequately control her symptoms and that she required

hydrocodone for breakthrough pain. In light of these difficulties, she requested that Dr. Williams prepare a medical source statement outlining her limitations. He prepared a letter on the same day which explained that Plaintiff:

> continues to suffer from chronic lumbar disc disease which has resulted from injury sustained in a work related accident. As such, she is capable of working but with the following restrictions: no lifting of more than 10-15 pounds, avoidance of repetitive bending, twisting, stooping, crawling, climbing, kneeling and squatting. In addition she must not be made to walk, sit or stand for more than 60 minutes at a time. Total duration of workday should not exceed 5 hours, 5 days per week. She is reevaluated her[e] on a monthly or bimonthly basis.

(AR at 501.) After visiting her pain management specialist, Azher Iqbal, M.D. who recommended a second epidural steroid injection, Plaintiff received an injection on June 5, 2013. Thereafter, on July 2, 2013, Plaintiff attended a follow-up visit with Dr. Huckell who noted that both her first and her second epidural steroid injections "only provided temporary partial pain relief lasting several days." (AR at 1108.) Dr. Huckell further observed that, in light of the lack of significant central stenosis in Plaintiff's most recent MRI, surgical options remained a "last resort." *Id.* Following her appointment with Dr. Huckell, she returned to Dr. Iqbal for a follow-up appointment on July 16, 2013. On physical examination, he noted "[s]ignificant tenderness of the right SI joint" and "limited flexion and extension with pain[.]" (AR at 1050.) A right sitting straight leg raise was positive. Dr. Iqbal opined that Plaintiff could "benefit from [a] right SI joint injection" and recommended that Plaintiff pursue this option. (AR at 1051.)

On August 26, 2013, Plaintiff saw Dr. Williams and reported that narcotic pain medication managed her breakthrough pain but that she was unable to perform household chores or walk or stand for prolonged periods. Plaintiff further reported that her most recent epidural steroid injection resulted in "severe pain[.]" (AR at 1112.) Dr. Williams discontinued one of Plaintiff's medications which was causing her constipation, but otherwise continued her prescription regimen unchanged. Thereafter, on September 4, 2013, Plaintiff attended an annual physical at JRFP. She reported decreased hearing in her left ear, seasonal allergies, lower back pain, and challenges related to obesity. The

attending physician noted that Plaintiff had a history of ear surgeries as a teenager, and offered a hearing aid which Plaintiff declined. Physical examination revealed a normal gait and no musculoskeletal abnormalities. On September 30, 2013, Plaintiff again met with Dr. Williams, who recorded that Plaintiff cancelled a scheduled epidural steroid injection and reported that pain medications had relieved her symptoms and had "been helping her to walk more and go shopping for example in the mall." (AR at 1113.) On October 2, 2013, neurosurgery clinic physicians evaluated Plaintiff and noted that, although she reported continued lower back pain, "her symptoms have been stable" and discharged her from their care. (AR at 1064.)

Throughout December 2013 and January 2014, Plaintiff saw Natasha Kleiman, N.P. at Zenith for pain management and trigger point injections. At these visits, Plaintiff reported that her pain was "intolerable 10/10" in the mornings, but that it gradually improved with movement and activity as the day progressed. (AR at 1114.) She indicated that the combination of a Butrans patch and hydrocodone provided her with an approximately forty percent reduction in pain and that she tolerated these medications well. When Plaintiff exhausted her supply of medications, her pain became intolerable. Nurse Kleiman adjusted Plaintiff's prescriptions during this period and counseled her on pain management strategies.

On February 5, 2014, Plaintiff returned to the neurosurgery clinic which had discharged her in October 2013, complaining of increased back pain. Upon physical examination, Kenneth Snyder, M.D. observed a mildly antalgic gait together with tenderness to palpation and muscle spasm along the length of "the entire neural access." (AR at 1071.) A straight leg raising test was positive on the right side. Plaintiff could heel and toe rise with minimal difficulty and possessed intact bilateral strength in all extremities. Dr. Snyder noted that Plaintiff experienced "improvement with just two sessions of physical therapy" and opined that "she would benefit significantly from undergoing a full course of physical therapy." *Id.* On February 18, 2014, Plaintiff saw Dr. Williams and reported continued back pain but stated that it was generally relieved through medication. She stated that she could perform more household chores and

requested a list of physical restrictions as she sought a return to employment. Dr. Williams did not record any physical abnormalities at this appointment.

On April 2, 2014, Plaintiff saw staff at Jericho Road Community Health Center ("JRCHC") and presented a list of health challenges including decreased hearing, allergies, lower back pain, obesity, depression, and alcoholism. Plaintiff acknowledged that she had previously consumed liquor six times per day, but had reduced to three or four times per day and then stopped drinking altogether. She was counseled to continue abstaining from alcohol. With regards to her depression, Plaintiff reported feeling sadness "sometimes but not most days." (AR at 1086.) She denied any change in appetite, anxiety, or guilt, but admitted that she felt "bad that [she was] not working." *Id.* She had no suicidal thoughts and was awaiting a counseling appointment. Plaintiff was diagnosed with moderate depressive disorder and prescribed Wellbutrin.

Plaintiff returned to Dr. Williams on May 20, 2014 and informed him that physical therapy provided some relief from her symptoms in combination with medications, that she was able to walk for longer duration, and that she was able to engage in social visits using public transportation. Physical examination revealed a slightly antalgic gait and weak bilateral heel and toe walking. Dr. Williams noted that Plaintiff's affect was normal, her memory was grossly intact, and her speech was articulate and fluent. He prescribed additional physical therapy and pain medication to manage her symptoms.

On June 3, 2014, Plaintiff attended a psychiatric evaluation at JRFP with Mary Lou George, a licensed clinical social worker. She reported that she had been experiencing "increased periods of sadness and stress related to job loss and caregiving responsibilities." (AR at 1092.) She identified anxiety, crying, and feelings of depression, guilt, helplessness, and being overwhelmed as contributing symptoms. Ms. George found Plaintiff to be cooperative, alert and oriented, with normal mood and clear and appropriate thought processes. Her judgment, insight, attention span, concentration, and memory were grossly intact. She was diagnosed with moderate recurrent major depressive disorder, assessed as a low risk for suicide, and referred to cognitive behavioral therapy.

Plaintiff returned to JRCHC on June 4, 2014 for a follow-up appointment with Kirk A. Scirto, M.D. Her physical examination was normal, but Dr. Scirto noted that Plaintiff continued to suffer from lower back pain. He also recorded Plaintiff's obesity and consumption of between three and four beers per day. He recommended that she modify her diet and reduce her alcohol intake. Plaintiff reported occasional sadness and decreased energy, but denied suicidal thoughts, anxiety, or guilt. Dr. Scirto also noted Plaintiff's report of occasional sudden-onset shortness of breath, which he speculated could be due to panic attacks. On September 4, 2014, Plaintiff attended an additional follow-up appointment with Dr. Scirto. At this appointment, she definitively reported experiencing a "wheeze . . . when panic attacks happen," and described them as occurring "occasionally for [a] few minutes." (AR at 1097.) Plaintiff acknowledged that she continued to drink between three and four beers per day, and that she continued to experience difficulty with weight loss and diet. Dr. Scirto's physical examination findings were unchanged from his June 2014 evaluation, but he included a new diagnosis of panic disorder without agoraphobia and reviewed deep breathing techniques with Plaintiff to manage her panic symptoms.

At a December 9, 2014 follow-up mental health evaluation with Ms. George, Plaintiff appeared "somewhat improved since her last visit in May." (AR at 1100.) She, however, "continue[d] to struggle with some depression and frustration because she has been unable to secure employment." *Id.* Plaintiff further expressed concern regarding her recent twenty-pound weight gain and lack of physical activity, and admitted that she did "a lot of drinking." *Id.* She reported mild to moderate anxiety, irritably, and sadness but stated that she felt "better compared to last visit." *Id.* Ms. George observed that Plaintiff was alert and oriented, her speech was clear and appropriate, and her mood and affect were normal. She possessed clear and appropriate thought processes without delusions, hallucinations, obsessions, preoccupations, or somatic thoughts. In addition, her memory, attention span, concentration, judgment, and insight were grossly intact. Ms. George assessed Plaintiff as having no risk for suicide and scheduled her for a follow-up appointment.

On February 19, 2015, Plaintiff returned to JRCHC for a follow-up examination with Dr. Scirto. Plaintiff continued to report challenges with weight gain and alcohol consumption, and Dr. Scirto counseled her to increase her exercise, modify her diet, and reduce her consumption of alcohol. Dr. Scirto also noted that Plaintiff remained in mental health counseling but had recently missed appointments. Upon physical examination, Plaintiff demonstrated lumbar paraspinal tenderness but had a negative straight leg raising test and possessed intact reflexes. Other findings were normal.

### B. Plaintiff's Function Report.

On or about June 6, 2015, Plaintiff completed a Function Report in connection with her application for SSDI benefits, wherein she indicated that she lived alone in an apartment located in Buffalo, New York. She began her day by making coffee after using the bathroom, and then watched television or read. She explained that she did not leave her home except to attend appointments or to shop for groceries and household goods, which she did approximately once per month. She spoke with her sons and parents over the telephone on a daily basis and visited her parents twice a month. She explained that she did not engage in any other social activities because her "back condition ke[pt her] from going places and stay[ing] out for long." (AR at 193.)

Plaintiff was able to dress herself slowly and with difficulty. Caring for her hair took more than ten minutes because Plaintiff's arms became numb. She was able to use the toilet and taking care of other personal grooming requirements, but did so slowly and with caution due to pain in her back and neck. Plaintiff was able to feed herself and prepare simple meals which did not require prolonged standing at the stove. She did her own laundry, made her bed, and watered her plants.

Plaintiff reported that she was unable to lift heavy objects, bend, reach, stand or sit for long periods, walk for long distances, or sleep well, all of which caused her back, neck, and leg pain. She was able to perform each of these activities prior to her back injury. She explained that she was "always in pain" and that she could not sleep on her side or her back. (AR at 189.) She described her pain as alternatingly "dull[,]"

"stabbing[,]" or "ach[ing][,]" spanning from her bilateral lower back through her right leg and foot. (AR at 196.)

Plaintiff was unable to sit for longer than ten minutes without back pain and numbness in her legs, and was likewise unable to climb more than five steps before experiencing the same symptoms. She stated that she was unable to kneel, squat, or reach at all. Plaintiff wore a back brace "most of the time" and reported that it was prescribed by a doctor. (AR at 195.)

With respect to her cognitive function and mental health, Plaintiff denied difficulty paying attention, following written or spoken instructions, getting along with coworkers or supervisors, or significant difficulty with memory. She conveyed that she felt depressed and would "just cry," and that she "sometimes [felt] like [she was] trapped in the house because of [her] condition." (AR at 196.)

### C. Consulting Assessment.

On or about August 1, 2013, John Schwab, D.O. performed a consulting physical examination of Plaintiff in connection with her SSDI application. She noted a prior ruptured ear drum, difficulty breathing at night, and lower back pain as a result of her workplace injuries as relevant physical ailments. During this examination, Plaintiff denied using alcohol, but admitted to prior use beginning in 1986 and continuing through 2010, consuming between fix and six beers daily during that period. With regard to her activities of daily living ("ADLs"), Plaintiff stated that she cooked two or three times per week, cleaned with assistance, did laundry twice per week, and shopped "rarely." (AR at 1056.) She enjoyed watching television, listening to the radio, and reading.

Physical examination revealed that Plaintiff was five feet three inches tall and weighed 164 pounds at the time of the assessment. She had no difficulty changing for the examination or getting on and off the examination table. Plaintiff possessed a normal stance and gait and did not use any assistive devices, but had difficulty with heel and toe walking and squatting. A musculoskeletal examination indicated full flexion, extension, lateral flexion, and bilateral rotary movement in Plaintiff's cervical spine, no scoliosis, kyphosis, or other abnormalities in her thoracic spine, and some decreased range of

motion in her lumbosacral spine. A straight leg raising test was normal bilaterally in the seated position at twenty degrees. Dr. Schwab found that Plaintiff was in otherwise normal health. He diagnosed some decreased hearing in Plaintiff's left ear and low back pain and opined that "[s]he has mild restriction to bending, lifting and carrying. Otherwise, no restrictions based on the findings of [this] examination." (AR at 1057.)

**D.    Testimony at the ALJ Hearing.**

At the April 27, 2015 hearing before ALJ Weir, Plaintiff testified that she possessed a high school education and did not undergo any special vocational training. She was not working at the time of the hearing. She described her prior employment as a laundry supervisor in the housekeeping department at the Adam's Mark Hotel. In that position, she supervised approximately seven other employees in the laundry department, as well as assisted other housekeeping staff manage linen for use in the hotel's guestrooms. Her typical workday lasted eight hours, and involved pushing and pulling approximately seventy pound carts. In June 2011, she "injured [her] back pulling/pushing carts and folding clothes, bending, twisting." (AR at 37.) Plaintiff then clarified that she believed her injury was the cumulative result of many years of demanding physical labor.

Following her injury, Plaintiff returned to work in a part-time capacity with physical restrictions. Even with these restrictions, working exacerbated her pain and her doctor would "tak[e] [her] out of work." (AR at 38.) She received workers' compensation payments as a result of her absences from employment, beginning after her injury and continuing until 2014, when she agreed to a settlement with the state employment agency. She testified that her employment with the Adam's Mark Hotel was terminated in November 2011 and that she had not returned to gainful employment since that date, in part due to her physical limitations. She stated that she searched for "customer service work like office, answering phones, something like that[,]" but that she was unable to find part-time employment in that field. (AR at 39.) Plaintiff did not look for full-time employment "because of [her] pain" which prohibits her from "perfom[ing] the same was [she] was when [she] was working full-time." *Id.*

Plaintiff described her symptoms as "constant pain" from her lower back through her hips, legs, and feet which "comes really hard and goes, but it stays." (AR at 40.) She stated that, on her best day her pain was an eight out of ten, and on her worst day a ten out of ten. When her pain was at its worst, Plaintiff testified that it could last for eight to nine hours, typically when she did not take narcotic pain medication to manage her symptoms. Plaintiff explained that medication was the only consistently effective treatment for her back pain, and that injections provided approximately a week of relief before her symptoms returned. Even with medication, however, Plaintiff was not able to perform any additional activities. Her medications also caused side-effects including dizziness, lightheadedness, dry mouth, and stomach discomfort. She testified that Dr. Huckell explained her surgical options but could not promise that they would improve her condition. In light of the potential for complications, Plaintiff elected not to pursue surgery.

With regard to her physical limitations, Plaintiff testified that she could walk "[m]aybe a block. Not even." (AR at 45.) She could stand for approximately half an hour in a single position, and one hour cumulatively in a single day. Similarly, she could sit for approximately forty-five minutes before needing to stand up or change positions. She spent most of her time in her bedroom lying down. Plaintiff stated that she could lift and carry between five and ten pounds, including objects similar in weight to a bag of groceries. A basket of laundry, however, exceeded her capacity. Plaintiff avoided pushing, pulling, bending, squatting, and climbing stairs because they caused her increased pain. She explained that she recently gained weight which impacted both her ability to "move around" and her back pain, increasing its severity. (AR at 36.)

Plaintiff stated that she "fe[lt] sad most of the time[,]" in part because she felt like "a burden to people, to my sons." (AR at 49.) She had been seeing a mental health counselor approximately once per month prior to the hearing, but at the time of the hearing she was attending counseling approximately once every two months. She did not know why her counselor had increased the interval between sessions. Plaintiff did not feel that her counseling sessions had improved her depression, explaining that "it helps at

the moment I'm talking to her, but then it's like after I finish with her I'm going right back to where I was." *Id.* She also explained that she occasionally experienced challenges with memory and concentration "[d]ue to [her] pain and [her] depression." (AR at 50.) Plaintiff testified that she no longer enjoyed social interactions with others as a result of her depression and stress, and that her physical limitations were a contributing factor to her mental health challenges.

Plaintiff was able to complete most ADLs, albeit with some modifications or limitations. She performed household cleaning in her apartment, but occasionally received assistance from her daughter-in-law. She prepared her own meals, but did not use the stove regularly. Similarly, she occasionally did her own laundry and grocery shopping. She was unable to sweep, mop, or vacuum because these activities increased her pain.

In response to questions from the ALJ, Plaintiff acknowledged that she had consumed alcohol within the week preceding the hearing, but initially denied ever having been intoxicated. She further denied that medical professionals had advised her to decrease or eliminate her consumption of alcohol. Following these denials, the ALJ informed Plaintiff's counsel that "the record is replete with mentions of alcoholism, alcohol abuse disorder, doctors asking for the claimant to cut back." (AR at 59.) After the ALJ read portions of these treatment notes into the record, Plaintiff's counsel requested a recess which the ALJ granted. When the hearing reconvened, Plaintiff acknowledged that several doctors had requested her to reduce or eliminate her consumption of alcohol, and that "it was kind [of] embarrassing for me to talk about it." (AR at 62.)

Following Plaintiff's testimony, the VE testified that Plaintiff's prior work experience most closely matched the roles of laundry worker, licensed practical nurse, and children's attendant as defined in the Department of Labor's Dictionary of Occupational Titles ("DOT"). The VE explained that Plaintiff's employment as a laundry worker was performed at the heavy exertional level, and that her work as a licensed practical nurse and children's attendant was performed at the light exertional

level. The ALJ then presented the VE with two hypothetical individuals with Plaintiff's vocational and educational background. The first individual was limited to lifting and carrying twenty pounds occasionally and ten pounds frequently, could only occasionally bend, stoop, reach, twist, crawl, or climb, and could sit, stand, or walk for sixty minutes at a time. This first hypothetical individual was also limited to sitting for six out of eight hours in a workday, and standing or walking for two out of eight hours, each at sixty minute intervals. The VE opined that, given those limitations, the hypothetical individual could not perform any of Plaintiff's past work or any work existing in significant numbers within the national economy. In response to a question from Plaintiff's counsel, the VE opined that the first hypothetical individual, further limited by an ability to lift a maximum of fifteen pounds and to work for five hours per day, could neither perform Plaintiff's past work nor any work in the national economy. If the second hypothetical individual possessed the same postural limitations as the first, but was able to sit for two hours at a time instead of sixty minutes, and was able to sit for two out of eight hours in a workday, and could stand or walk for six out of eight hours in sixty minute intervals, the VE opined that individual could perform the representative roles of a gate guard and shipping and receiving clerk, both of which existed in significant numbers within the national economy. Plaintiff's counsel inquired whether the second hypothetical individual, further limited to only infrequent contact with the general public, could perform the representative occupations, and the VE opined that he or she could not.

## III.  Application of the Five-Step, Sequential Framework.

In order to receive SSDI benefits, a claimant must be disabled on or before his or her date last insured. SSA regulations set forth the following five-step, sequential framework to determine whether a claimant is disabled:

> (1) whether the claimant is currently engaged in substantial gainful activity;
> (2) whether the claimant has a severe impairment or combination of impairments; (3) whether the impairment meets or equals the severity of the specified impairments in the Listing of Impairments; (4) based on a "residual functional capacity" assessment, whether the claimant can perform any of his or her past relevant work despite the impairment; and
> (5) whether there are significant numbers of jobs in the national economy

that the claimant can perform given the claimant's residual functional
capacity, age, education, and work experience.

*McIntyre v. Colvin*, 758 F.3d 146, 150 (2d Cir. 2014) (citing 20 C.F.R.

§§ 404.1520(a)(4)(i)-(v), 416.920(a)(4)(i)-(v)). "The claimant has the general burden of

proving that he or she has a disability within the meaning of the Act, and bears the burden

of proving his or her case at [S]teps [O]ne through [F]our of the sequential five-step

framework established in the SSA regulations[.]" *Burgess v. Astrue*, 537 F.3d 117, 128

(2d Cir. 2008) (internal quotation marks and citation omitted). At Step Five, "the burden

shift[s] to the Commissioner to show there is other work that [the claimant] can perform."

*McIntyre*, 758 F.3d at 150 (alterations in original) (internal quotation marks omitted).

In this case, ALJ Weir concluded at Step One that Plaintiff had not engaged in

substantial gainful employment since June 5, 2011, her alleged onset date. At Step Two,

he concluded that Plaintiff possessed the severe impairments of degenerative disc disease

and obesity. The ALJ further concluded that Plaintiff possessed the medically

determinable impairment of depressive disorder, but found that this disorder did not

cause more than minimal limitations with regard to Plaintiff's ability to perform basic

mental work activities. The ALJ's evaluation of Plaintiff's mental impairments was

made with reference to the four functional categories contained within Listing 12.00C of

the SSA's Listing of Impairments, found at 20 C.F.R. Part 404, Subpart P, Appendix 1.

These include: (1) ADLs; (2) social functioning; (3) concentration, persistence, and pace;

and (4) episodes of decompensation. The ALJ determined that the record evidence did

not support any limitations caused by Plaintiff's depressive disorder with regard to these

functional areas, and therefore concluded that SSA regulations required a finding of non-

severity.

The ALJ next considered the effect of Plaintiff's depressive disorder on her mental

RFC in light of her history of mental health treatment. He observed that social workers

from JRCHC noted Plaintiff's occasional sadness and alcohol abuse, but consistently

recorded her clear and cogent thought processes, intact memory and attention span, and

lack of anxiety or guilt. In light of these observations, the ALJ gave "the diagnosis of

21

depressive disorder little weight, as it is not consistent with the criteria from the DSM-IV[.]" (AR at 14.) He also observed that "there is mention of significant alcohol abuse, which has a depressive effect." *Id.*

At Step Three, the ALJ determined that none of Plaintiff's severe impairments, either in isolation or combination, met or medically equaled the severity of a listed impairment at 20 C.F.R. Part 404, Subpart P, Appendix 1. The ALJ evaluated Plaintiff's degenerative disc disease in view of Listing 1.04, which encompasses disorders of the spine. Because Plaintiff had no evidence of nerve root compression or sensory defect in her extremities, the ALJ concluded that this listing was not satisfied. He further analyzed Plaintiff's disc disease in light of her obesity, in accordance with SSA guidelines, but concluded that Plaintiff's weight did not elevate the severity of her spine disorder to the degree necessary to satisfy the Listings criteria. The ALJ did note, however, that Plaintiff's obesity should be factored into Plaintiff's physical RFC.

At Step Four, the ALJ found that Plaintiff possessed the RFC to lift and carry twenty pounds occasionally and ten pounds frequently and could occasionally bend, stoop, reach, twist, crawl, and climb. He further found that Plaintiff could sit for two hours in an eight hour work day and could stand and walk for six hours in an eight hour work day, but could remain in each position for a maximum of sixty minutes at a time. In reaching this decision, the ALJ reviewed Plaintiff's medical record and concluded that Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms; however [Plaintiff's] statements concerning the intensity, persistence and limiting effects of those symptoms are not entirely credible[.]" (AR at 17.) The ALJ afforded Dr. Huckell's opinion significant weight, in light of his lengthy treatment relationship with Plaintiff and the consistency between his functional assessments and his clinical observations. He also noted Dr. Williams's September 10, 2011 opinion that Plaintiff could return to work with lifting and postural limitations following her injury in January 2011, and afforded great weight to Dr. Schwab's consulting examination which "was consistent with [his] largely unremarkable

examination findings." (AR at 22.) At Step Four, the ALJ found that Plaintiff's RFC did not permit her to perform any of her past work.

At Step Five, the ALJ found that Plaintiff could perform the representative occupation of a shipping and receiving clerk, which existed in significant numbers within the national economy. He therefore concluded that she was not disabled.

## IV. Conclusions of Law and Analysis.

### A. Standard of Review.

In reviewing the Commissioner's decision, the court "'conduct[s] a plenary review of the administrative record to determine if there is substantial evidence, considering the record as a whole, to support the Commissioner's decision and if the correct legal standards have been applied.'" *Cichocki v. Astrue*, 729 F.3d 172, 175-76 (2d Cir. 2013) (quoting *Kohler v. Astrue*, 546 F.3d 260, 265 (2d Cir. 2008)). Substantial evidence is "'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).

Even if the court could draw different conclusions after an independent review of the record, the court must uphold the Commissioner's decision when it is supported by substantial evidence and when the proper legal principles have been applied. *See* 42 U.S.C. § 405(g). It is the Commissioner that resolves evidentiary conflicts and determines credibility issues, and the court may not substitute its own judgment for that of the Commissioner. *See Yancey v. Apfel*, 145 F.3d 106, 111 (2d Cir. 1998); *Aponte v. Sec'y, Dep't of Health & Human Servs. of U.S.*, 728 F.2d 588, 591 (2d Cir. 1984).

### B. Whether the ALJ Improperly Relied on his Own Lay Opinion or Failed to Obtain Necessary Medical Opinion Evidence.

Plaintiff argues that the ALJ improperly relied on his own lay opinion when he determined that she did not suffer from a severe mental impairment at Step Two. She further contends that the ALJ continued to rely on his own assessment of her mental impairments when he discounted her diagnosis of major depressive disorder for purposes of formulating her mental RFC at Step Four. She argues that this is erroneous even

though the ALJ deemed her mental impairment non-severe at Step Two because the ALJ was required to consider even non-severe impairments when formulating Plaintiff's mental RFC.

As a preliminary matter, because the ALJ considered all of Plaintiffs impairments, both severe and non-severe, at Steps Four and Five, any error in his Step Two analysis is harmless. *See Reices-Colon v. Astrue*, 523 F. App'x 796, 798 (2d Cir. 2013) (summary order) ("the ALJ identified other severe impairments . . . and therefore proceeded with the subsequent steps. And, in those subsequent steps, the ALJ specifically considered her anxiety and panic attacks. Because these conditions were considered during the subsequent steps, any error was harmless.") (internal quotation marks and citations omitted) (citing *Zabala v. Astrue*, 595 F.3d 402, 410 (2d Cir. 2010)); *see also McAllister v. Colvin*, 205 F. Supp. 3d 314, 326 (E.D.N.Y. 2016) ("the Court finds no reversible error with regard to the ALJ's assessment of plaintiff's impairments because the ALJ identified other severe impairments at step two of the analysis so that plaintiff's claim proceeded through the sequential evaluation process, and in those subsequent steps, the ALJ considered plaintiff's claims of shoulder and obesity impairments in addition to her other impairments.").

The ALJ's decision to discount her depressive disorder diagnosis at Step Four, however, is more problematic. Plaintiff acknowledges that "nothing in the record speaks to the functional limitations that [Plaintiff] might have as a result of her mental impairments[.]" (Doc. 11-1 at 16.) However, although Plaintiff "bears the burden of proving . . . her case at step[] . . . four[,]" *Burgess*, 537 F.3d at 127, ALJ Weir had a duty to develop the record through a consultative psychological examination where there was no record evidence of the possible functional limitations caused by Plaintiff's depression. *See Tankisi v. Comm'r of Soc. Sec.*, 521 F. App'x 29, 32 (2d Cir. 2013) (summary disposition) (noting that "[i]t can be reversible error for an ALJ not to order a consultative examination when an examination is required for an informed decision"). A functional assessment by a qualified medical source would have permitted the ALJ to make an informed determination of Plaintiff's mental RFC. Instead, the ALJ compared

24

the clinical symptoms reflected in Plaintiff's treating providers' notes with the symptoms of major depressive disorder listed in the Diagnostic and Statistical Manual, Fourth Edition ("DSM-IV"). After comparing the symptoms, the ALJ concluded that Plaintiff's treating providers' diagnoses were "not consistent with the criteria from the DSM-IV[.]" (AR at 14.) This analysis was legally erroneous because "the ALJ cannot arbitrarily substitute his own judgment for competent medical opinion . . . While an ALJ is free to resolve issues of credibility as to lay testimony or to choose between properly submitted medical opinions, he is not free to set his own expertise against that of a physician[.]" *Balsamo v. Chater*, 142 F.3d 75, 81 (2d Cir. 1998) (internal quotation marks and alterations omitted).

Moreover, an ALJ cannot extrapolate from raw medical data when formulating the RFC, in light of the ALJ's lack of medical expertise. In this case, the ALJ not only analyzed the diagnosis provided by a non-medical source and essentially rejected it, he further pointed out that alcohol was a depressant with the inference that Plaintiff's alcoholism may be causing her depression. An ALJ is not permitted to draw these types of conclusions based upon his or her own lay opinion. *See Cestare v. Colvin*, 2016 WL 836082, at *2 (W.D.N.Y. Mar. 4, 2016) ("Generally, an ALJ is not qualified to assess a claimant's RFC on the basis of bare medical findings, and as a result an ALJ's determination of RFC without a medical advisor's assessment is not supported by substantial evidence.) (internal quotation marks omitted); *see also Sweet v. Berryhill*, 2017 WL 2615439, at *14 (D. Vt. June 16, 2017) ("An ALJ is not qualified to analyze raw medical data, and must interpret the medical evidence through the expert opinion of a physician.") (internal quotation marks omitted); *Kain v Colvin*, 2017 WL 2059806, at *3 (W.D.N.Y. May 15, 2017) (internal quotation marks omitted) (citing *Englert v. Colvin*, 2016 WL 3745854, at *4 (W.D.N.Y. July 8, 2016)). "When the record contains medical findings merely diagnosing the claimant's impairments without relating that diagnosis to functional capabilities, the general rule is that the Commissioner may not make the connection himself." *Id.* (internal quotation marks omitted) (citing *Englert*, 2016 WL 3745854, at *4). If the ALJ makes "inferences or diagnoses which are not advanced in

the medical record[,]" such that the RFC determination is not supported by substantial evidence, then remand is required. *Glover v. Astrue*, 2010 WL 1035440, at *4 (W.D.N.Y. Mar. 18, 2010) (citing *Curry v. Apfel*, 209 F.3d 117, 123 (2d Cir. 2000)).

Although the ALJ's treatment of Plaintiff's mental impairments was in error, the court must still consider whether that error was harmless in this case. *See Hanley ex rel. Leger v. Berryhill*, 2018 WL 1602849, at *14 (D. Vt. Mar. 29, 2018) (citing *McIntyre*, 758 F.3d at 148). The Second Circuit has not articulated a specific test for harmless error in Social Security appeals, it has, however, noted that an error cannot be deemed harmless if "there is a substantial possibility" that the plaintiff would have "prevailed" absent the ALJ's mistake. *Pollard v. Halter*, 377 F.3d 183, 192 (2d Cir. 2004). This approach comports with the Ninth Circuit's observation that an error may be deemed harmless only if it is "inconsequential to the ultimate nondisability determination." *Carmickle v. Comm'r, Soc. Sec. Admin.*, 533 F.3d 1155, 1162 (9th Cir. 2008) (emphasis omitted). In accordance with this standard, the ALJ's decision must be vacated and remanded if there is a substantial possibility that the results of a consulting psychological examination and the appropriate weighing of her diagnosis for depression might have affected the ALJ's ultimate disability determination.

Although a close call, the court concludes that there is more than a *de minimus* possibility that a consulting psychological examination may alter the ALJ's analysis of Plaintiff's mental RFC. In particular, a question posed to the VE indicated that a prohibition on frequent contact with the general public would disqualify Plaintiff from representative occupations which the VE opined were available to her in significant numbers in the national economy. Accordingly, remand is required. On remand, the ALJ should obtain a consulting functional assessment of Plaintiff's mental impairments and determine what effect, if any, that assessment has on his determination of Plaintiff's mental RFC at Step Four.

C.   Whether the ALJ Improperly Characterized Two Treating Physicians' Opinions.

Although remand is required to address Plaintiff's mental RFC, the court briefly considers Plaintiff's other contentions so that the ALJ may address them contemporaneously.  Plaintiff maintains that, although ALJ Weir acknowledged both Dr. Williams's and Dr. Huckell's treating physician opinions, he did not fully reconcile or explain discrepancies in their functional assessments with his physical RFC determination.  Plaintiff further argues that, because the ALJ did not reconcile these differences, his evaluation of the medical opinion evidence violates the SSA's "treating physician rule."

"[T]he SSA recognizes a treating physician rule of deference to the views of the physician who has engaged in the primary treatment of the claimant[.]"  *Burgess*, 537 F.3d at 128 (internal quotation marks omitted).

> Treating source means [the claimant's] own acceptable medical source who provides [the claimant], or has provided [the claimant], with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with [the claimant].  Generally, we will consider that [the claimant has] an ongoing treatment relationship with an acceptable medical source when the medical evidence establishes that [the claimant] see[s], or [has] seen, the source with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation required for [the claimant's] medical condition(s).

20 C.F.R. § 404.1527(a)(2).  Treating physicians "are likely . . . most able to provide a detailed, longitudinal picture of [a claimant's] medical impairment(s)" and they "may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations."  20 C.F.R. § 404.1527(c)(2).

"[T]he opinion of a claimant's treating physician as to the nature and severity of the impairment is given 'controlling weight' so long as it 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] record.'"  *Burgess*, 537 F.3d at 128 (alteration in original) (quoting 20 C.F.R. § 404.1527(c)(2)).  If an ALJ does not accord a treating

physician's opinion "controlling weight," he or she is required to give "good reasons" for the lesser weight assigned. 20 C.F.R. § 404.1527(c)(2); *Burgess*, 537 F.3d at 129. "The requirement of reason-giving exists, in part, to let claimants understand the disposition of their cases, even – and perhaps especially – when those dispositions are unfavorable." *Snell v. Apfel*, 177 F.3d 128, 134 (2d Cir. 1999). "[F]ailure to provide good reasons for not crediting the opinion of a claimant's treating physician is a ground for remand." *Greek v. Colvin*, 802 F.3d 370, 375 (2d Cir. 2015) (internal quotation marks omitted).

If a medical opinion from a treating physician is given less than controlling weight, the ALJ must consider: (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship; (3) the "relevant evidence" provided in support of the opinion, "particularly medical signs and laboratory findings"; (4) the consistency of the opinion with the record as a whole; (5) whether the treating physician is giving an opinion "about medical issues related to his or her area of specialty"; and (6) any other relevant factors which tend to support or contradict the opinion. 20 C.F.R. § 404.1527(c)(1)-(6) (explaining that "[u]nless we give a treating source's medical opinion controlling weight . . . , we consider all of the following factors in deciding the weight we give to any medical opinion").

Plaintiff notes that Dr. Williams provided at least two functional assessments, one on September 10, 2011, and another on April 17, 2013. The September 10, 2011 assessment, included in a routine progress note, authorizes Plaintiff's return to work with no lifting, bending, twisting, or reaching above her head. He assessed her as 50% temporarily impaired for purposes of her New York State workers' compensation claim. His April 17, 2013 "[t]o whom it may concern" letter states:

> [Plaintiff] continues to suffer from chronic lumbar disc disease which has resulted from [an] injury sustained in a work related accident. As such, she is capable of working but with the following restrictions: no lifting of more than 10-15 pounds, avoidance of repetitive bending, twisting, stooping, crawling, climbing, kneeling and squatting. In addition she must not be made to walk, sit or stand for more than 60 minutes at a time. Total duration of workday should not exceed 5 hours, 5 days per week. She is reevaluated her[e] on a monthly or bimonthly basis.

(AR at 501.)

In his analysis of the medical opinion evidence, ALJ Weir noted that "Dr. Williams opined on September 10, 2011 that [Plaintiff] could return to work with no lifting, bending, or twisting[]." (AR at 22.) The ALJ pointed out, however, that "[s]ubsequent office notes indicate that [Plaintiff] said her medications enabled her to walk more" as well as perform other ADLs. *Id.* He later observed that the RFC "is supported by the medical record, as a whole, including opinions by Dr. Huckell and Dr. Williams," demonstrating his consideration of their opinions in light of the totality of the evidence.

As a general matter, "an ALJ is not required to discuss every piece of evidence submitted[,]" and "[a]n ALJ's failure to cite specific evidence does not indicate that such evidence was not considered." *Brault v. Comm'r of Soc. Sec. Admin.*, 683 F.3d 443, 448 (2d Cir. 2012). Moreover, "[a]lthough the ALJ's conclusion may not perfectly correspond with any of the opinions of medical sources cited in his decision, he [is] entitled to weigh all of the evidence available to make an RFC finding that [is] consistent with the record as a whole." *Matta v. Astrue*, 508 F. App'x 53, 56 (2d Cir. 2013) (summary order) (citing *Richardson v. Perales*, 402 U.S. 389, 399 (1971)). The primary inquiry remains whether the ALJ's decision is supported by "substantial evidence." *Cichocki*, 729 F.3d at 175.

The ALJ reviewed Plaintiff's lengthy medical history, observing that her reports of pain and immobility gradually improved with medication and physical therapy. In light of this review, in combination with his acknowledgment and incorporation of Dr. Williams's September 2011 assessment and later office notes, ALJ Weir's failure to specifically address Dr. Williams's April 2013 "to whom it may concern" letter was not reversible legal error. *See Mongeur v. Heckler*, 722 F.2d 1033, 1040 (2d Cir. 1983) ("When, as here, the evidence of record permits us to glean the rationale of an ALJ's decision, we do not require that he have mentioned every item of testimony presented to him or have explained why he considered particular evidence unpersuasive or insufficient to lead him to a conclusion of disability.") Nevertheless, in view of Dr. Williams's

lengthy treating relationship and the frequency of his evaluations of Plaintiff, the ALJ should address this evidence on remand and describe what weight, if any, he or she affords it.

Plaintiff also points out an apparent discrepancy between postural limitations imposed by Dr. Huckell and those incorporated into the RFC. She does not, however, provide any further argument with respect to this issue, and does not identify which of Dr. Huckell's numerous notes is at odds with the ALJ's RFC findings, or in what manner it conflicts. Consequently, this contention is arguably waived. Nevertheless, as the Commissioner correctly observes, ALJ Weir expressly gave "significant weight to Dr. Huckell, who consistently opined [that Plaintiff] should avoid bending, stooping, reaching, twisting, crawling or climbing." (AR at 22.) The ALJ's analysis of Dr. Huckell's assessments was supported by several record citations to his treatment notes. In his RFC formulation, the ALJ limited Plaintiff to only occasional bending, stooping, reaching, twisting, crawling, or climbing. The SSA defines "occasionally" as "occurring from very little up to one-third of the time." SSR 83-10, 1983 WL 31251, at *5 (Jan. 1, 1983). Thus, to the extent Plaintiff contends the ALJ failed to afford Dr. Huckell's opinion the deference due under the treating physician rule, her argument is without merit. The ALJ afforded great weight to Dr. Huckell's opinion and reflected that opinion in Plaintiff's RFC.

## CONCLUSION

For the foregoing reasons, the court GRANTS Plaintiff's motion for judgment on the pleadings (Doc. 11) and DENIES the Commissioner's motion for the same (Doc. 13). SO ORDERED.

Dated at Burlington, Vermont, this __4th__ day of September, 2018.

Christina Reiss, District Judge
United States District Court